**UNITED STATES of America**

v.

**Paul PADILLA, Defendant.**

**No. CR–90–0785 (CBA).**

United States District Court,
E.D. New York.

Aug. 6, 1991.

Jonathan S. Sack, Asst. U.S. Atty., Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for U.S.

Vivian Shevitz, New York City, for defendant.

## CORRECTED OPINION AND ORDER

AMON, District Judge.

### INTRODUCTION

On December 18, 1990, a jury convicted the defendant Paul Padilla of conspiring and attempting to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B) (Counts One and Two); forcibly assaulting and resisting Special Agents John Henderson, Nicholas Maggio, and Rene Robinson of the Drug Enforcement Administration (DEA) in violation of 18 U.S.C. § 111 (Counts Three, Four, and Five); and attempted murder of Agents Henderson and Robinson in violation of 18 U.S.C. §§ 1111, 1114 (Counts Six and Eight). The jury acquitted the defendant of attempted murder of Agent Maggio (Count Seven).

Defendant moves for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on Counts Six and Eight. He further seeks a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on Counts Three, Four, and Five.

### BACKGROUND

Special Agents John Henderson, Nicholas Maggio, and Rene Robinson of the DEA testified to the following facts surrounding the arrests of defendants, which formed the basis for the assault and attempted murder charges.

The events commenced with the arrest of Rosa Arias at the airport in Miami, Florida in possession of two kilograms of cocaine. Arias agreed to cooperate with agents of the DEA in making a controlled delivery of the drugs. She advised the agents that she was supposed to deliver the drugs to "Rachel" in New York and was to be picked up at La Guardia Airport by individuals driving a maroon-colored van. She gave descriptions of both Rachel and the other individuals who were involved and likely to pick her up; namely, Rachel's son "Paulie"

and her boyfriend, Luis Medina. Arias flew to New York accompanied by Agent Henderson. Sometime after they arrived, Henderson was notified that the maroon van had been spotted on the upper level of the airport.

Officers were sent ahead of Arias and Henderson to position themselves around the van. Arias approached the van with Henderson walking in front of her and Agent Robinson behind her. Arias was initially greeted by her boyfriend, Luis Medina. Padilla was in the driver's seat of the van and his co-defendant Juan Torres was in the passenger's seat. The sliding passenger-side door of the van was open. Both Padilla and Torres were looking around the area. Padilla made eye contact with Henderson. When Arias and Medina walked toward the van, Henderson moved in to make the arrests.

Henderson ran towards the van and shouted in English and Spanish "police, don't move." Robinson, who was in front of the van at this point, drew her gun and shouted "police, freeze" several times in English and Spanish. Agent Maggio approached the driver's side of the van, shouted "police, freeze" several times, and pointed his gun at Padilla. Henderson reached through the open door of the van and grabbed Torres by the shirt to pull him out of the van prompting Padilla to put the van into gear. Henderson started to get into the van to prevent Padilla from leaving. Padilla looked at Henderson and then looked at Maggio and cursed. He lunged the van forward at an angle towards Maggio, striking him in the shoulder and forearm and pinning him against a taxi that had pulled alongside the van. The van quickly pulled away from the curb with Henderson partially inside the van holding onto Torres.

As the van sped away, Padilla looked at Henderson then swerved the van to the right towards a parked car. The van struck the car, causing the door of the van to slam shut on Henderson and throwing him to the floor of the van. Padilla drove alongside of the parked car, with Henderson pinned in the van by the door

and his feet dragging on the ground. The van proceeded directly at Agent Robinson who was in front of the van. In order to escape injury, Robinson jumped back onto the hood of the parked car. Robinson's legs were struck by the door of the van as it passed the car. Henderson testified that Padilla looked at Henderson several times while the van was in motion.

Henderson raised his gun towards Padilla. Torres reached down towards the gun preventing Henderson from aiming it at Padilla's chest. Henderson fired the gun at Padilla's legs, Padilla slumped in his seat, and the van slowed to a stop. Padilla and Torres were then arrested.

## DISCUSSION

### I. *Attempted Murder Counts*

Defendant contends that he is entitled to a judgment of acquittal on the attempted murder counts.

Section 1114 states, in relevant part, that whoever attempts to kill any of the federal officers listed in the section "engaged in or on account of the performance of his official duties ... shall be punished as provided under sections 1111 [murder] and 1112 [manslaughter] of this title ..." 18 U.S.C. § 1114.

Section 1111 of Title 18 sets forth the elements of first and second degree murder. "Malice aforethought," which distinguishes murder from manslaughter, is an element of both first and second degree

murder.[1] *United States v. Fleming,* 739 F.2d 945, 947 (4th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973 (1985); *United States v. Shaw,* 701 F.2d 367, 392 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). "Malice does not require a subjective intent to kill, but may be established by evidence of conduct which is 'reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *Shaw,* 701 F.2d at 392 n. 20 (quoting *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978)); *accord Fleming,* 739 F.2d at 947–48.

█ Consistent with the *mens rea* requirement for the principal offense of second degree murder, the jury was instructed without objection that an element of the attempted murder charge was that the defendant acted with "malice aforethought."[2] Defendant now contends that this instruction was erroneous in that it permitted the jury to convict him of attempted second degree murder without a finding that he specifically intended to kill Agents Henderson and Maggio.[3]

In *Braxton v. United States,* — U.S. ——, 111 S.Ct. 1854, 114 L.Ed.2d 385 (1991), the Court discussed whether the defendant's agreement to certain facts for the purposes of his plea to assault and firearms counts "specifically established"

---

1. In addition to malice, first degree murder requires proof of a "premeditation design." 18 U.S.C. § 1111(a); *see also United States v. Shaw,* 701 F.2d 367, 392 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). The defendant was charged with second degree murder.

2. The instruction read to the jury stated, in pertinent part:
   Proof of the existence of malice does not require a showing that the accused harbored hatred or ill will against the federal officers. Neither does it require proof of an intent to kill or injure. Malice may be established by evidence of conduct which is reckless and wanton and so gross a deviation from a reasonable standard of care that you may reasonably infer that the defendant was aware of a serious risk of death or serious bodily harm.

You may find the defendant guilty of attempted second degree murder if the government has proved beyond a reasonable doubt that he acted with a heart that was without regard to the life and safety of others.
(Transcript of Trial at 502–03).

3. Defendant also argues that there was insufficient evidence to support a finding of malice since the agents were not killed. This argument is without merit. As the government points out, malice is the state of mind with which the defendant acts and does not depend on the results of his conduct. The issue is not whether the evidence was sufficient to prove malice as the court defined it, but rather whether malice as defined was a sufficient level of *mens rea* to sustain a charge of attempted murder.

an attempt to kill under 18 U.S.C. § 1114 within the meaning of Section 1B1.2(a) of the U.S. Sentencing Commission Guidelines Manual. The Court concluded that the agreed-to facts were insufficient because "even if one could properly conclude that the stipulation 'specifically established' that Braxton had shot 'at the marshals,' it would also have to have established that he did so with the intent of killing them." 111 S.Ct. at 1859. The Court further explained:

> Since the statute [18 U.S.C. § 1114] does not specify the elements of "attempt to kill," they are those required for an "attempt" at common law, see *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952), which include a specific intent to commit the unlawful act. "Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." [citations omitted].

*Id.* n.* *.

The government appears to concede that this is at least a correct statement of the common law. (*see* Government's Letter dated July 22, 1991 at 2). Indeed, this specific intent requirement existed under both English and American common law as early as the mid–19th Century. *See* W. Clark & W. Marshall, *Law of Crimes* § 121, at 151 (3d ed. 1927), and cases cited at n. 26. This doctrine is still considered the common law rule in the majority of state jurisdictions. *See* Annotation, *What Constitutes Attempted Murder*, 54 A.L.R.3d 612 § 3 (1973 & Supp.1989) (collecting cases); 4 C. Torcia, *Wharton's Criminal Law* § 743 (14th ed. 1981).

The government nonetheless argues that Congress intended to change the common law rule when it enacted Section 1114. *See United States v. Everett*, 700 F.2d 900, 904 (3d Cir.1983) (quoting *Morissette v. United*

*States*, 342 U.S. 246, 273, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952)) ("Even if [a term used in a criminal statute] had a generally accepted common law meaning, the courts will not impose that meaning if there are 'grounds for inferring an affirmative instruction on Congress' to define it otherwise.").

The legislative history of Section 1114, however, provides little support for the government's position. Consistent with the common law, the Senate Judiciary Committee stated:

> To constitute an attempt under this section, *the defendant must engage in conduct with the intention of killing the victim* and the conduct must constitute a substantial step toward the killing.

S.Rep. No. 225, 98th Cong., 1st Sess. 328 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182 [hereinafter 1983 Senate Report] (emphasis added). In a footnote following this statement, the Committee referred to a previous report it issued in connection with its consideration of the Criminal Code Reform Act of 1981, S. 1630, 97th Cong., 1st Sess., 127 Cong.Rec. 20,926 (1981), which would have added a general attempt provision to Title 18.[4] It is this report, S.Rep. No. 307, 97th Cong., 1st Sess. (1981) [hereinafter 1981 Senate Report], that supplies the basis for the government's argument that proof of "specific intent" is unnecessary in a prosecution for attempted second degree murder, and that, as instructed, the jury in this case need only have found that the defendant acted with "malice."[5]

The 1981 Senate Report separated the concept of *mens rea* into two categories: (1) defendant's mental state as it relates to his own conduct, and (2) defendant's mental state as it relates to the circumstances attendant to the crime and the results of defendant's conduct.[6] *See id.* at 165.

---

4. S. 1630 was ultimately not enacted by Congress.

5. The term "malice" may encompass several distinct levels of *mens rea*, including an intent to kill. *See generally Comber v. United States*, 584 A.2d 26, 38–40 (D.C.1990) (en banc). As used in this opinion, however, the term is intended to

mean malice aforethought as defined on page 37, *supra*.

6. The concepts of conduct, results, and circumstances are explained and illustrated in the comments to the Model Penal Code. *See* 2 *Model Penal Code and Commentaries (Official Draft and Revised Comments)* § 5.01, at 301–06 (1985). "Conduct" relates to the defendant's

With respect to defendant's conduct, the Committee stated that it was necessary for the defendant to have "consciously desired to perform the conduct." *Id.* As to defendant's mental state as it relates to the results of defendant's conduct, which includes the death of the victim, as well as the circumstances of the crime, the Committee stated that the defendant need only be "acting with the state of mind otherwise required for the commission of a crime."[7] *Id.* The government is therefore correct that under the 1981 Senate Report, malice, which is the sufficient mental state relating to the results of defendant's conduct for second degree murder, would be sufficient in a prosecution for attempted second degree murder.

The obstacle the government faces, however, is the specific statement in the 1983 Senate Report that attempted murder requires the defendant to have the "intention of killing the victim." 1983 Senate Report, *supra,* at 328. Although this statement conflicts with the statement in the 1981 Senate Report that the defendant need only be "acting with the state of mind otherwise required for the commission of a crime," the 1981 Senate Report, which was elaborating on attempt liability generally, cannot be considered controlling. Rather, it is apparent that by citing the 1981 Senate Report the Judiciary Committee was referencing only the discussion in its previous report on the elements of attempt that were not inconsistent with the stated requirement of specific intent. Even if such a construction were not apparent and the ambiguity remained, the ambiguity should be resolved in favor of the defendant, especially in light of the established common law view that specific intent is a necessary element of attempted murder. *See United States v. Gaggi,* 811 F.2d 47, 58 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987) ("a time-honored tenet of statutory construction directs that a court called upon to apply an ambiguous penal statute should not construe it in favor of sanctions, but strictly in favor of lenity").

Furthermore, the Supreme Court has expressly stated that such specific intent is a necessary element under Section 1114. *Braxton,* 111 S.Ct. at 1859 n.* *; *see also United States v. Martinez,* 775 F.2d 31, 35–36 (2d Cir.1985). The government's attempt to characterize the Court's statement as non-binding dicta is unpersuasive. Although the principal issue before the court was an application of the facts to a provision of the sentencing guidelines, the issue of the elements necessary to establish attempted murder under Section 1114 was directly before the Court.

■■■ Accordingly, I hold that the jury charge in this case was erroneous in that it failed to instruct the jury that it was necessary for the government to prove beyond a reasonable doubt that Padilla intended to kill Agents Robinson and Henderson. I further find that the error, which related to an essential element of the crime, was not harmless beyond a reasonable doubt. *See United States v. Doherty,* 867 F.2d 47, 57–58 (1st Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989), and cases cited therein.[8]

own actions. *Id.* at 301. An example of "conduct" is "breaking and entering" in burglary. *Id.* n. 9. A "result" is an outcome of defendant's conduct that is part of the principal offense, which includes death in a homicide case. *Id.* "The 'circumstances' of the offense refer to the objective situation that the law requires to exist in addition to the defendant's act or any results that the act may cause." *Id.* An example of "circumstances" is the victim's status as a federal officer under 18 U.S.C. § 1114. *Id.* at 302; *see also* 1981 Senate Report, *supra,* at 164–65.

7. The Judiciary Committee's approach to attempt liability may be compared with the Model Penal Code's formulation. The 1981 Senate Report and the Model Penal Code differ, however, with respect to the culpability standard as it relates to the *results* of defendant's conduct. Under the Code, the defendant must either affirmatively desire to cause the result that will constitute the principal offense or *believe* that the result will occur (whether or not he affirmatively *desires* the result to occur). 2 *Model Penal Code and Commentaries (Official Draft and Revised Comments)* § 5.01, at 301, 304–05 (1985).

8. The government has advised the court by letter dated August 2, 1991 that it will not seek to retry the defendant on Counts Six and Eight and will move to dismiss the counts at the time of sentencing in view of this ruling.

**40**

II. *Assault Counts*

Defendant further argues that he is entitled to a new trial on Counts Three, Four, and Five because the evidence was insufficient to establish an "intent to injure," the state of mind which he argues is required to be proven for an assault under 18 U.S.C. § 111. The defendant concedes that the evidence was sufficient to establish that the defendant committed other acts constituting conduct prohibited by Section 111— *i.e.*, resisting, opposing, impeding, intimidating, or interfering with a federal agent—but argues that the convictions are infirm since it cannot be determined from the jury's general verdicts the precise way in which it found the defendant violated the statute. Accordingly, citing the decision of the Second Circuit in *United States v. Garcia*, 907 F.2d 380, 381 (2d Cir.1990), defendant maintains that the possibility that the convictions were based upon a finding of assault requires reversal. The defendant's argument fails for three reasons.

■ First and dispositive of the claim, I concur with the holdings of the Ninth and Tenth Circuit Courts of Appeal that assault as proscribed by Section 111 is a general intent crime which does not require proof of "an intent to injure." *United States v. Jim*, 865 F.2d 211 (9th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 93, 107 L.Ed.2d 58 (1989); *United States v. Sanchez*, 914 F.2d 1355, 1358 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991); *United States v. Hill*, 526 F.2d 1019, 1027 (10th Cir.), *cert. denied*, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). Although the Second Circuit has not specifically addressed the intent requirement for an assault under Section 111, it has analyzed similar federal assault statutes as general intent crimes. *United States v. Gan*, 636 F.2d 28, 29 (2d Cir.1980), *cert. denied*, 451 U.S. 1020, 101 S.Ct. 3011, 69 L.Ed.2d 392 (1981) (interpreting 18 U.S.C. § 112 which proscribes assaulting a foreign official as not requiring proof of intent to injure); *United States v. Martin*, 536 F.2d 535, 536 (2d Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 167, 50 L.Ed.2d 141 (1976) (holding that assault as proscribed by 18 U.S.C. § 113(d) does not require intent to injure).

Second, assuming intent to injure were an element of Section 111, it was sufficiently proven in this case. Although defendant repeatedly refers to his panicked intent to flee as being his only state of mind, when one views the evidence in the light most favorable to the government, it supports the inference that although Padilla undoubtedly intended to flee, he also intended to incapacitate the major obstacles to his flight, namely three law enforcement officers with guns who were trying to prevent his escape.

■ Finally, even if "intent to injure" were an element of Section 111 and it was not established, defendant would still not prevail on his request for a new trial. The other forms of conduct constituting violations of Section 111 for which there was concededly enough evidence do not constitute sufficiently different theories of the case on the facts presented to call into question the validity of the verdicts.

## CONCLUSION

For the reasons stated above, the government's motion at sentencing to dismiss Counts Six and Eight which was prompted by this ruling will be granted, and the defendant's motion for a new trial on Counts Three, Four, and Five is denied.

SO ORDERED.